UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JAMES DAVIS, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:16-cv-00271-SNLJ |
| | ) |
| DUNHAM'S ATHLEISURE CORP. and | ) |
| CENTURY INTERNATIONAL ARMS | ) |
| | ) |
|       Defendants. | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Century International Arms' motion for summary judgment (#55) and Dunham Athleisure Corp.'s motion for summary judgment (#58). These motions have been fully briefed. For the reasons explained below, this Court will **DENY** Century's motion and will **GRANT IN PART and DENY IN PART** Dunham's motion.

## I. BACKGROUND

Plaintiff James Davis grew up shooting a variety of firearms—including shotguns, rifles, and pistols. One particular variety of firearms familiar to plaintiff is the bolt-action rifle, which he learned to used when he was 13 or 14 years old. Plaintiff has owned, cleaned, and hunted with bolt-action rifles since at least 2001.

On November 14, 2015, plaintiff purchased a Mosin-Nagant Model 91/30 bolt-action rifle from Dunham's store in Poplar Bluff, Missouri. Dunham, for its part, had purchased the rifle from Century—an importer of vintage firearms. When sold to

1

plaintiff, the rifle came with a manual and a white tag warning that it was not newly manufactured and, therefore, must be inspected by a qualified gunsmith before being used. Plaintiff does not recall whether the white tag was attached to the rifle at the time of purchase, but he admits receiving it.

The Mosin-Nagant has a unique history and profile. It is a magazine-fed, five-shot bolt-action military rifle developed by Imperial Russia (now the Russian Federation) sometime in the 1890s. Manufacturing of it was discontinued in the 1960s, and it has since gained popularity with firearm collectors and enthusiasts. It also has a unique safety design. Rather than traditional "on/off" levers, the Mosin-Nagant utilizes a knob on the bolt's cocking piece that can disengage the fire control and lock the bolt into a closed position.

Vintages rifles, such as the one plaintiff purchased, often come packed in greasy substance called "cosmoline" that prevent them from degrading. Thus, when plaintiff returned home from Dunham's shop, he read over the manual and set about dissembling and cleaning the rifle's components. As plaintiff dissembled his rifle, he removed the bolt from the receiver and "broke it down even further removing [the] firing pin and striker spring" so that all pieces could be cleaned. Satisfied that all components were "spotless," plaintiff explains that he reassembled the rifle in "reverse order" and had no problems putting the pieces back together.

The next day, plaintiff took his Mosin-Nagant out with him to hunt deer. Plaintiff acknowledges he did not test or sight the rifle beforehand, but explains that he had shot a Mosin-Nagant before that was "extremely accurate"—thus trusting the rifle would do

well without prior preparations. Plaintiff eventually spotted a deer and successfully fired a single round, hitting the deer without killing it. Plaintiff then attempted to fire a second round to kill the deer. This time, however, plaintiff states he immediately felt "an intense pain coming from right below [his] right eye" and as he put his hand to his face he could feel that it was "covered in blood." The parties agree that, on the second shot, the rifle's safety knob was not fully lowered causing the bolt to be in a partially-locked position. This resulted in the bolt "explod[ing] backwards into plaintiff's face." Two defense experts opine that the incident occurred as a result of plaintiff improperly reassembling the firing pin the night before while cleaning it—opinions that plaintiff does not refute.

As a result of his injury, plaintiff filed a six-count complaint against Dunham and Century that was later removed to this Court. Counts I, II, and III are directed at Dunham for negligence, strict liability, and breach of warranty, respectively. Counts IV, V, and VI are directed at Century, also for negligence, strict liability and breach of warranty, respectively.

Dunham had previously moved to dismiss the counts against it under Missouri's "innocent seller" statute—Section 573.762, RSMo. While acknowledging the issues involved presented a "close call," this Court ultimately denied Dunham's motion. *See Davis v. Dunham's Athleisure Corp., et al.*, 2017 WL 1329475 (E.D. Mo. Apr. 11, 2017) (Limbaugh, J.). During the briefing of their current summary judgment motions, Dunham has mostly adopted the arguments of Century—though Dunham also specifically renews its arguments under the innocent seller statute, as well.

**II. ANALYSIS**

## A. Standard of Review

Summary Judgment involves the "threshold inquiry of determining whether there is a need for trial." *Walls v. Petrohawk Properties, LP.*, 812 F.3d 621, 624 (8th Cir. 2015) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). In other words, summary judgment is appropriately granted if, in viewing the record in a light most favorable to the nonmoving party, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating both the absence of a genuine issue of material fact and his or her entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial burden is met, the nonmoving party must then set forth, by affidavit or other rebuttal evidence, specific facts showing that a genuine issue of material fact actually exists. *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005); FED. R. CIV. P. 56(e). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Anderson*, 477 U.S. at 247-248). Thus, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion to dismiss." *Id*. Moreover, even when a dispute is genuine—such that a jury

could reasonably favor either side—it must also be the case that the disputed facts are material in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

### B. Count I—Negligence Against Defendant Dunham

Count I of plaintiff's complaint focuses on Dunham's negligence for having failed to either inspect or warn of the possibility the Mosin-Nagant could be "fired out of battery" (a reference to the bolt being in an abnormal firing position that prevents a round from being fully chambered).

In contrast with a strict liability claim, proving a negligence claim "focuses on what the [seller] knew rather than on the product." *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 466 (Mo. banc. 2017). Thus, the elements of a negligence action are: (1) the existence of a duty on the part of the defendant to protect plaintiff from injury; (2) failure of defendant to perform that duty; and (3) injury to plaintiff resulting from such failure. *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 98 (Mo. App. W.D. 2006). These elements come with the important caveat that "[a] seller-retailer who neither knows nor has reason to know that a product manufactured by another is defective has no duty to test or inspect the product, and his failure to inspect will ordinarily not render him liable for injuries." *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 241 (Mo. App. E.D. 1987); *see also Griffin v. Kandi Technologies Corp.*, 454 S.W.3d 341, 347 (Mo. App. S.D. 2014) (stating that the first of the three elements, whether couched as a failure to warn or failure to inspect claim, requires that the "seller knew or

5

had reason to know that the chattel is or is likely dangerous for the use for which it is supplied.")

Here, as Dunham point outs "there is no evidence Dunham knew of any dangerous condition with the firearm" for which a duty to warn or duty to inspect might be established. To the contrary, the rifle was apparently coated in a grease-like preservative called cosmoline during Dunham's ownership of it, limiting an ability to inspect it. And while plaintiff states that "the firing pin adjustment on the type of rifle at issue is a known danger," known *to whom* is left unclear. If it was so well-known as to be common knowledge, plaintiff—who the facts indicate is experienced with bolt-action rifles—could not reasonably argue that a warning was required. *Grady v. Am. Optical Corp.*, 702 S.W.2d 911, 915 (Mo. App. E.D. 1985) ("[M]anufacturers and distributors are not under a duty to provide warnings about dangers which are open and obvious, or which are commonly known."). On the other hand, if the danger was known only to a select few—such as vintage gun enthusiasts or specialty gun shops primarily trading in vintage firearms—this vague allegation by itself cannot arise to the level of suggesting Dunham, specifically, knew or had reason to know of a dangerous condition. *See Griffin*, 454 S.W.3d at 347-348 (Mo. App. S.D. 2014) (stating that "reason to know" means "the actor has information" for which a dangerous condition could be reasonably inferred and holding that the mere fact of selling a product does not show a seller knew or had reason to know that a product was likely to be dangerous).

Because plaintiff fails to assert any facts tending to show that Dunham—specifically—either knew or should have known about the alleged dangerous conditions

of the Mosin-Nagant rifle, the Court will grant summary judgment to Dunham as to count I. *See Malone*, 965 S.W.2d at 186 (affirming summary judgment where plaintiff raised no facts supporting a finding that retailer knew or should have known of dangerous condition of product).

### C. Count II—Strict Liability Against Defendant Dunham

Count II of plaintiff's complaint focuses on Dunham's strict liability for having failed to warn him of the "dangerous condition" of the rifle's design. Dunham's response, though, is that plaintiff's claim is disallowed by the innocent seller statute, which provides for dismissal of a products liability claim that bases liability "solely on [defendant's] status as a seller in the stream of commerce." § 537.762.1, RSMo.

Missouri Courts have explained that Section 537.762 "addresses similar concerns" as the Model Uniform Product Liability Act, which "attempts to achieve a balance between protecting non-manufacturers, except from their own negligence or specific guarantees, and protecting an innocent consumer's right to recover." *Malone v. Schapun, Inc.*, 965 S.W.2d 177, 181 (Mo. App. E.D. 1997); *see also* Model Uniform Product Liability Act, 44 Fed.Reg. 62714 (1979). Notwithstanding Section 537.762, "a seller is still liable for its own negligence or other conduct"—such as providing express warranties—"other than its status as a seller in the stream of commerce." *Malone*, 965 at 182.

By its terms, Section 537.762 applies only to claims based, at least in part, on strict liability. *See* §§ 537.760 (defining "products liability claim" as being based, at least in part, on strict liability), 537.762 (limiting innocent seller protections to "products

7

liability claims"). In Missouri, strict liability can be based on a design defect, manufacturing defect, or a failure to warn. *Pitman v. Ameristep Corp.*, 208 F.Supp.3d 1053, 1060 (E.D. Mo. 2016) (*citing Magnuson by Mabe v. Kelsey-Hayes Co.*, 844 S.W.2d 448, 455 (Mo. App. W.D. 1992)). There is no dispute that Dunham did not design or manufacture the rifle. Instead, plaintiff focuses on Dunham's failure to warn of the rifle's "dangerous propensities when the rifle was put to its normal and intended use."

A strict liability failure-to-warn claim (as contrasted with a negligent failure-to-warn claim) focuses upon the product rather than the conduct of the manufacturer or seller. *Spuhl v. Shiley, Inc.*, 795 S.W.2d 573, 577 (Mo. App. E.D. 1990). Given that the focus is upon the product and not the seller or the seller's conduct, the innocent seller statute would seem to bar plaintiff's strict liability claim if that was all that remained at issue in this case. In this respect, plaintiff's strict liability claim would be against Dunham merely because of its status as a seller of the product-at-issue, having no concern over whether Dunham engaged in additional conduct beyond that of a seller. Indeed, as *Malone* points out, Section 537.762 seeks to protect a seller except against "its own negligence or other conduct other than its status as a seller," which a strict liability claim does not concern itself with. *See Malone*, 965 S.W.2d at 182. Plaintiff essentially acknowledges this result by suggesting he would "concede the innocent seller statute may be applicable [but for] Dunham's [giving of] additional direction, warnings, warranties, [and] marketing information"—referencing the so-called "warranty" at-issue in count III.

In that regard, and having found Dunham was not independently negligent under Count I above, the only other conduct taken by Dunham, beyond selling the rifle, was to

8

provide a so-called express "warranty" to plaintiff that is addressed in the analysis of Count III below. But, as will be explained, Dunham did not provide a warranty—or at least not one that would apply to plaintiff's particular injury. As such, there is no "negligence or other conduct other than [Dunham's] status as a seller" for which a strict liability failure-to-warn claim can piggyback on. *Id.*; *see also McMahon v. Robert Bosch Tool Corp.*, 2018 WL 3036455 at *3 (E.D. Mo. June 19, 2018) (holding the innocent seller statute cannot apply to block strict liability claims where the action also involves surviving claims for independent negligence); *McDonald v. Char-Broil, LLC,* 2016 WL 6871275 at * (W.D. Mo. Nov. 21, 2016) (accord). Simply put, what is left of the claims against Dunham pertain solely to its status as a seller. Thus, it is entitled to innocent seller status and the statutory protections associated therewith. See Mo. Rev. Stat. 537.762.1

But, even so, there is a second requirement under the statute as highlighted in *Malone*: "*an innocent seller*"—even if such a status is established—"should not be dismissed unless the injured party is ensured that another defendant, *who is not an innocent seller*, is properly before the court and can satisfy the injured party's claim." 965 S.W.2d at 182 (emphasis added). "Thus, similar to the Model Act, dismissal of a non-manufacturer … should not be granted where the product manufacturer is not subject to process under Missouri law or is insolvent." *Id.*; *see also* § 537.762.2 ("This section shall apply to any products liability claim in which another defendant, including the manufacturer, is properly before the court and from whom *total recovery* may be had for plaintiff's claim." (emphasis added)).

9

Accordingly, although this Court is inclined to view Dunham as an innocent seller, it must be assured that plaintiff could obtain a "total recovery" in Dunham's absence against a party who is not also an innocent seller. Where it is unclear who the manufacturer of the product-at-issue was, or where it is otherwise unclear that a total recovery can be had against the parties remaining in suit, it is error to apply the innocent seller statute. *See Malone*, 965 S.W.2d at 183-184.

Here, of course, Dunham is neither the manufacturer nor designer of the Mosin-Nagant. In the absence of the true manufacturer / designer as a party-defendant in this suit, perhaps Century, as the only accessible up-stream defendant, can satisfy a total recovery in plaintiff's favor should he win at trial. But, many of Century's arguments are similarly based on the idea that it, too, had no duty to plaintiff since it neither manufactured nor designed the Mosin-Nagant. In fact, Dunham mostly adopts Century's arguments. All in all, it is unclear—and Dunham makes no effort to explain—what might transpire for purposes of Section 537.762.2 should the Court grant Dunham protection as an innocent seller. Accordingly, Dunham is given innocent seller status, but the protection of that status is contingent on a full recovery from Century in the event Century is found liable. The motion for summary judgment on count II is, therefore, denied.

### D. Count III—Breach of Express Warranty Against Defendant Dunham

According to plaintiff, Dunham made the following express "warranty"[1] on a written "Safety Notice" provided at the time of sale:

> "You should always keep the barrel pointed in a safe direction, even when dry firing, loading or unloading. In the event of an accident discharge, no injury can occur if the barrel is pointed in a safe direction."

Plaintiff seizes upon the second sentence for asserting liability against Dunham. But, for whatever legal ramification that sentence may have, it is not a warranty—or, at minimum, is not a warranty applicable to plaintiff's asserted theory of liability.

Indeed, "[a] warranty is a statement or representation made by the seller of goods … having reference to the *character, quality, or title* of the goods … on which it is intended that the buyer shall rely in making the purchase." *Mitchell v. Rudasill*, 332 S.W.2d 91, 94-95 (Mo. App. E.D. 1960) (emphasis added); *see also Nestle Purina Petcare Co. v. Blue Buffalo Co, Ltd.*, 181 F.Supp.3d 618, 642 (E.D. Mo. 2016). The elements for a breach of express warranty claim are that: (1) the defendant sold a good to the plaintiff; (2) the seller made a statement of fact about the kind or quality of the good; (3) the statement of fact was a material factor inducing the buyer to purchase the good;

---

[1] Count III of plaintiff's complaint addresses both express warranties and implied warranties of merchantability under Section 400.2-314, RSMo. However, the parties' briefing focuses exclusively on Dunham's so-called express warranty provided in the safety notice given to plaintiff. Under Rule 10(b), "if doing so would promote clarity, each claim founded on a separation transaction or occurrence … must be stated in a separate count[.]" FED. R. CIV. P. 10(b). "Complaints that violate … Rule 10(b) … are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). There is some support that a court may *sua sponte* "strike the pleading and instruct counsel to replead" in conformity with Rule 10(b). *See, e.g,. Jackson v. Bank of America, N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018). The Court will not do so, here. However, plaintiff's complaint—including count III—suffers many of the criticisms of a "shotgun pleading" and, in considering count III here on summary judgment, it will be treated solely as a claim for breach of an express warranty notwithstanding any opaque references to Section 400.2-314.

11

(4) the good did not conform to the statement of fact; (5) the non-conformity injured the buyer; and (6) the buyer notified the seller of the non-conformity in a timely fashion." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. banc. 2010).

Plaintiff argues the Mosin-Nagant sold to him was of "below average quality in that it exploded upon use," implying that Dunham made a statement about the quality of the rifle—essentially that it was mechanically sound and capable of firing at the time of sale. But, it is difficult to surmise how the above statement makes any express reference to quality. Instead, the statement appears to be more of an instructional warning against careless handling than an express warranty as to the particular quality of the rifle. Moreover, in the same document there is a disclaimer of "all warranties" that also includes language by Dunham that the rifle has been in storage, packed in grease and oil for many years, and must be inspected before use—suggesting Dunham made clear to plaintiff (who admits to not having the gun inspected) that the rifle did not possess a ready-to-use quality.

Even to the extent the statement could be construed as some sort of warranty, it does not have a causal relationship to the injuries suffered by plaintiff. As Dunham points out, plaintiff has done nothing to show how elements four (non-conformity of the statement of fact) and five (injury caused by the non-conformity) can be demonstrated at trial. The facts of this case do not pertain to an accidental discharge in which injury resulted from the barrel of the gun even though it was pointed in a safe direction; instead, despite plaintiff's attempt to paint the picture that the gun "exploded," the undisputed facts indicate only that the bolt mechanism of the rifle blasted back into plaintiff's face

(having nothing to do with the barrel or what direction it was pointed) during an intentional discharge of the rifle. This is a result altogether different than what is embraced by the warranty.

In short, the statement by Dunham cannot reasonably be interpreted to act as a warranty covering the injuries suffered by plaintiff. Therefore, summary judgment will be granted to Dunham on count III.

### E. Count IV—Negligence Against Defendant Century

Plaintiff's negligence claim is that because the rifle can be fired "out of battery," it has a "design flaw," "is dangerous," and Century, therefore, had a duty to "warn[] potential purchasers of the known dangers." Century counters, citing the "Missouri strict liability statute," that "the product was not in a defective condition when it was sold [because] [p]laintiff created the 'defective' condition himself when he reassembled the rifle."

Distinctions between negligence and strict liability aside, the parties spend the majority of their briefing arguing about design-related aspects of the rifle—such as whether it has an "adjustable firing pin." Adjustable or not, both defendants' experts seems to agree that the rifle can become "extremely dangerous" when "in the condition of an improperly adjusted firing pin," which permits the "rifle's bolt self-engaging feature [to be] circumvented." This is a rifle, plaintiff argues, that is known to be dangerous because its safety features are susceptible to being circumvented through misassembly. This problem, plaintiff maintains, gives rise to a duty to warn and to provide adequate

cleaning and assembly instructions. Ultimately, these are matters to be decided by the fact-finder, and summary judgment is therefore inappropriate.

### F. Count V—Strict Liability Against Defendant Century

Plaintiff's strict liability failure to warn claim is predicated on the same facts as plaintiff's negligent failure to warn claim. That is, "there are no warnings provided anywhere with the subject rifle that warns of the dangers of the adjustable firing pin or ability of the gun to fire out of battery."

The elements of a strict liability failure to warn claim are: (1) the defendant sold the product in question in the course of its business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. *Moore*, 332 S.W.3d at 756. A failure to warn claim can concern a missing warning or a warning that is deficient. *Nesselrode*, 707 S.W.2d at 382. The key issue in a failure to warn case is whether the information included with the product "effectively communicates to the consumer or user the dangers that inhere in the product during normal use and the dangerous consequences that can or will result from misuse or abnormal use of the product." *Id*. In addition, "a warning, no matter how well stated or placed, is inadequate if it has no reasonable likelihood of reaching a foreseeable user[.]" *Johnson v. Medtronic, Inc.*, 365 S.W.3d 226, 235 (Mo. App. W.D. 2012).

Century's first defense is that it did, in fact, provide an adequate "white tag" warning, which stated:

> "WARNING: If this is a used or surplus firearm, it is not new, therefore, it must be inspected by a qualified gunsmith before firing."

And also a user manual that further warned:

> "Ensure bolt head is properly installed before attempting to fire this rifle. Failure to do so will result in property damage and personal injury."

It is Century's position that plaintiff simply failed to heed these warnings; therefore, "the alleged failure to warn cannot be deemed a proximate cause of his subsequent injuries."

Under these circumstances, however, this Court cannot award summary judgment in favor of Century. Foremost, the parties disagree whether the white tag warning and the user manual encompass the particulars that led to plaintiff's injury. Century points to its manual, for example, that says improper bolt-head installation may lead to injury, but it is plaintiff's primary theory that the actual instructions given to ensure proper assembly—notwithstanding the manual's general warning—were inadequate. Indeed, plaintiff states that he "disassembled and reassembled the rifle in accordance with the instruction manual," but nonetheless suffered injury from a mechanical failure with the bolt mechanism the next day. Ultimately, a factual dispute lies at the base of their arguments about whether the warnings given were sufficient to instruct against the dangers that befell plaintiff. *See, e.g., Pittman*, 208 F.Supp.3d at 1062 (E.D. Mo. 2016) (factual dispute regarding adequacy and detail of warnings and instructions precluded summary judgment).

In addition, because the parties agree that plaintiff's injury resulted following an attempt to reassemble his Mosin-Nagant after cleaning it, it is not altogether clear what effect Century's white tag warning (urging inspection by a gunsmith) would have had were it heeded by plaintiff. As the Court understands plaintiff's argument, the design of the rifle is such that user errors are possible when reassembling the rifle. Thus, even had a gunsmith inspected the rifle, it is plausible to believe plaintiff may have returned home, cleaned his rifle, and committed the same assembly error notwithstanding the inspection. Century asserts that it was likely a gunsmith would have noticed the mis-assembly issues upon inspection, but that assumes the inspection followed *after* plaintiff attempted to clean the rifle and reassemble it.

Century's second defense is the so-called "state-of-the-art defense" under Section 537.764, RSMo. This acts as a "complete defense" in a strict liability failure to warn claim when "the dangerous nature of the product was not known and could not reasonably be discovered at the time the product was placed into the stream of commerce." § 537.764.1, RSMo. Thus, the question is whether the dangerous condition was "scientifically knowable" at the time the product entered into the stream of commerce. *See Miller v. Yazoo Mfg. Co.,* 26 F.3d 81, 83 n.2 (8th Cir. 1994). Century wants to focus on Imperial Russia's conduct at the early, developmental stages of the Mosin-Nagant in an attempt to push the timeline as far back as the late 1890s or early 1900s. But, the parties appear to agree that manufacturing of the rifle was not discontinued until the early 1960s—more than half a century. These two bookends, in themselves, tell this Court nothing about when, specifically, the rifle entered into the

stream of commerce. And Century provides no law to suggest that a product enters into the stream of commerce when a sovereign government first manufactures a military weapon for its own internal use. Moreover, there are no facts present to indicate when Russia first began selling the rifle to other governments, military groups, or to the public-at-large. Even if such facts were provided, it is also unclear that inter-governmental transactions—to the extent they might be relevant—would be deemed "commercial" under Missouri state law. Without knowing the particular timeframe for which to apply Section 537.764, Century's state-of-the-art defense is inapplicable.

### G. Count VI—Breach of Implied Warranty Against Defendant Century

Plaintiff's complaint makes clear that count VI arises under § 400.2-314 RSMo., which pertains to a warranty mandatorily implied by statute. Thus, to the extent the complaint and the parties' briefings discuss the effects of alleged express warranties arising from Dunham's safety notice (which wouldn't apply to Century in any event) or Century's user manual, such discussions are irrelevant for purposes of count VI. The only dispute, then, appears to be whether plaintiff can prove the Mosin-Nagant sold to him was not "merchantable" when sold.

Section 400.2-314 creates an implied warranty of merchantability, which "warrants that goods must be at least fit for the ordinary purposes of which such goods are used." *Renaissance Leasing, LLC. v. Vermeer Mfg. Co*., 332 S.W.3d 112, 130 (Mo. banc. 2010). Said differently, Section 400.2-314 ensures a product lives up to "minimum level of quality," or, simply, "merchantable." *Hope v. Nissan North Am., Inc*., 353 S.W.3d 68, 91 (Mo. App. W.D. 2011); *In Re NuvaRing Products Liability Litigation*,

2013 WL 3716389 at *7 (E.D. Mo. Jul. 12, 2013). Thus, the elements of a merchantability claim under Section 400.2-314 are: (1) a merchant sold the good; (2) the good was not "merchantable" at the time of the sale; (3) the plaintiff or his property suffered injury and damages; (4) said injury and damages were caused by the defective nature of the good; and (5) the seller had notice of the plaintiff's injury. *Ragland Mills, Inc. v. Gen. Motors Corp.*, 763 S.W.2d 357, 360 (Mo. App. S.D. 1989).

As noted, the only dispute is over element two: whether the Mosin-Nagant was "merchantable" at the time it was sold to plaintiff. Again, Century argues it has been established "that the [rifle] was not defective when it was sold by Century [and that] it was plaintiff who created the dangerous condition by improperly reinstalling the firing pin." But, as explained above, it is not altogether clear that the rifle was not unreasonably dangerous when sold in relation specifically to its bolt mechanism, firing pin, and the warnings/instructions provided regarding reassembly after cleaning. Even if plaintiff had misassembled the rifle after cleaning it, liability attaches to foreseeable misuse. *Johnson*, 365 S.W.3d at 237 (*citing Nesselrode*, 707 S.W.2d at 381).

Century's conclusion that the rifle sold to plaintiff was "not defective" does not defeat count VI. What makes a product "merchantable" is a broad concept, encompassing a number of aspects such as fitness for ordinary use, adequacy of packaging and labeling, and conformity of any affirmations of fact made on any labels. *See* §§400.2-314(2)(c), (e), (f). Again, there is conflicting expert testimony suggesting the rifle has "no defects" yet can become "extremely dangerous" when "improperly adjust[ing the] firing pin." There is also plaintiff's argument that documentation provided by Century was either

inaccurate, insufficient , or simply non-existent in elucidating the dangers inherent in cleaning and reassembling the Mosin-Nagant's bolt mechanism. Accordingly, the Court believes the issue of merchantability is sufficiently disputed and, therefore, declines to grant summary judgment to Century on count VI.

### III. CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that defendant Century International Arms' motion for summary judgment (#55) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant Dunham Athleisure Corp.'s motion for summary judgment (#58) is **GRANTED IN PART and DENIED IN PART**.

Summary judgment is **GRANTED** on count I and count III.

Summary judgment is **DENIED** on count II.

So ordered this 23rd day of January 2019.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE